In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

**NO. 09-19-00319-CR**
_____

**KEENAN DWAYNE LEDOUX, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 163rd District Court**
**Orange County, Texas**
**Trial Cause No. B180408-R**

**MEMORANDUM OPINION**

A jury convicted Keenan Dwayne Ledoux of murder, determined that self-defense did not justify the shooting, and assessed punishment at forty-five years of incarceration. *See* Tex. Penal Code Ann. § 19.02(b)(1). In his first two issues, Ledoux challenges the sufficiency of the evidence to support a finding that he killed the victim intentionally or knowingly. In his third issue, Ledoux argues the evidence was insufficient because the State failed to prove beyond a reasonable doubt that he

1

did not act in self-defense. Upon our review of the full record in this case, we affirm the trial court's judgment.

## I. Background

Around 8:00 p.m. on the evening of July 4, 2017, Ledoux fired a 12-gauge shotgun loaded with double-aught buckshot once from close range into Gregory Goldsmith's chest.[1] CPR was unsuccessful, and Gregory died at the scene. The evidence established that Gregory was the stepfather of Ledoux's girlfriend, Raegan Fields. For several months prior to the shooting, Ledoux had been living in a portable building on the Goldsmiths' property near the main residence.

## II. Trial Evidence

### A. Testimony of Neighbor Theresa Howell

In July 2017, Theresa Howell lived across the street from Amber and Gregory Goldsmith, Raegan Fields, and Ledoux. Howell testified that around 8:00 p.m. on July 4, 2017, she was on her front porch grilling hot dogs. She explained that from her porch, she had a direct view across the street. As she grilled, Howell saw Gregory come out of his trailer and walk toward Ledoux's portable building. Howell denied anything unusual when Gregory walked out and described him as moving at a "normal walk." Howell testified that when Gregory approached the front of the

---

[1] For purposes of clarity, we refer to the victim, his wife, and stepdaughter by their first names.

2

building, she saw the barrel of a gun come out, someone screamed "'no' real loud," then Ledoux shot him, and Gregory fell forward. Howell could not hear anybody talking and the only thing "out of place[]" was him shooting Gregory. Howell testified that it looked as if Gregory took a step onto the porch of the building, and "the gun came out and [Ledoux] shot and [Gregory] fell forward." Raegan yelled "no" before the shot.

After Howell witnessed the shooting, she went inside to call 9-1-1. As she looked through the window from her house, she saw Ledoux "go off the side of the porch and head to the back of the yard[]" with the gun in his hand. She testified that she saw Amber exit the trailer and roll Gregory over with the help of another neighbor to perform CPR. Howell remained on the phone with 9-1-1 while they performed CPR on Gregory.

Howell did not see or hear Raegan and Gregory arguing the night the shooting occurred. Howell explained she did not hear any raised voices, except for Raegan screaming "no," just before the shot. She also denied telling police that Gregory charged toward anyone that night.

## B. Testimony of Neighbor Rodney Cole

Rodney Cole lives on the street where the shooting occurred. On the night of July 4, 2017, Cole was outside, a couple of doors down, talking to another neighbor, Gilbert Smith, when they heard a "huge bang." Thereafter, they observed a body

3

lying on the porch of the building outside the Goldsmiths' residence. Cole then described seeing a blonde-haired woman go over where the man was lying, "hollering like real loud[,]" and performing chest compressions. Cole testified he and Gilbert Smith walked down the street toward the scene and saw an unidentified man go toward a black truck in the yard, then he did not see the man anymore. Cole denied hearing anything unusual before the shot, including any loud voices.

## C. Testimony of Neighbor Gilbert Smith

Gilbert Smith, another of the Goldsmiths' neighbors, testified that a little after 8 p.m. on the night of July 4, 2017, he was outside talking to Rodney Cole. Smith testified that during this time, they heard a gunshot, then observed a lady doing chest compressions on a man who appeared to have been shot. Smith also described that he saw "what appeared [to be] a guy running around the yard, and then he went - - like he went around the building or something . . . and disappeared[.]" Smith explained that there was a black truck in the driveway, and it looked "like he was running back and forth in between the truck[]" and went "around maybe the back of the building[.]" Smith said the man was holding something, but he could not tell if it was a gun. Smith thought the victim fell straight forward in front of the door, but the lady might have rolled him over to do chest compressions. Smith likewise denied hearing anything out of the ordinary before the gunshot.

4

**D. Testimony of Investigator Jacob Rigsby**

On the night of July 4, 2017, Jacob Rigsby worked the night shift as a patrol deputy for the Orange County Sheriff's Office (OCSO). A little after 8 p.m., he received a call about a shooting on Carla Street in Vidor, Texas. Initially, due to its location, there was some question among the responding officers whether that was OCSO's jurisdiction or the City of Vidor's; even though Rigsby believed it was Vidor's, he made his way to the scene. On the way, Rigsby monitored radio traffic and learned about a possible suspect who had been detained on South Main Street just before Carla Street. Rigsby was the first officer to arrive on the scene of the shooting.

Rigsby testified that as he approached the small building, he observed a white male lying on his back on the front porch. He had concerns because the man did not show any signs of life and "had a large hole in his chest." Rigsby thought the man was deceased, which EMS later confirmed.

After they secured the scene, it became clear it would be a Vidor case, so when the Vidor Police arrived, OCSO released the scene to them, and Rigsby remained to assist with whatever they needed. Rigsby believed the man suffered a gunshot wound but did not see a weapon in the immediate vicinity. Rigsby later located the shotgun in an area on the other side of the fence by a building next door and notified the Vidor Police Department by radio. He secured the gun by putting crime scene

5

tape around it and stood there until someone could collect the weapon. Rigsby described the gun as a Mossberg, Model 88, 12-gauge shotgun.

**E. Testimony of Miles Stone**

Miles Stone testified that he is married to Amber's sister and was Gregory's brother-in-law. Stone explained that while they do not live on the same street, his wife's mother and other sister live on the same street as the Goldsmiths. Stone testified the Goldsmiths converted the portable building to living quarters for Ledoux, who began living there a few months before the shooting.[2] Stone testified that Ledoux dated Amber's daughter, Raegan.

Stone said in the days leading up to July 4, Amber and Gregory's marriage "was on the rocks[]" and "crumbling." Stone testified that Gregory was trying to find another place to live but needed some time. Stone expressed concern about Gregory, believed he was depressed, and he might have been on the verge of suicide. On July 3, Gregory reached out to Stone via text messaging, so Stone went fishing with Gregory and tried to offer him some help. He said that he wanted to help Gregory get back on his feet, and they discussed Gregory starting a mowing business. Stone testified that on July 3, they left around 7 or 7:30 p.m., and he dropped Gregory off at his house around 12:30 or 12:45 a.m.

---

[2] Stone testified that the Goldsmiths built the portable building in 2015 as a commercial kitchen, and the witnesses often referred to it as "the kitchen" throughout trial.

Stone said when they returned, they noticed Ledoux and Raegan exit the small building and go inside the main trailer, but there was no exchange of words. Stone testified that after he left, Gregory texted him around 1 a.m. Stone explained that Gregory's text expressed frustration that Ledoux and Raegan were sleeping together in his house, and he wanted to retrieve his dog from their room.

The following day, Stone and his family went to Stone's mother-in-law's house, next door to the Goldsmiths, for July 4. Stone testified that he did not see Gregory at his mother-in-law's home. Stone described a conversation that occurred during the family gathering. While on the porch, Ledoux relayed a story about Gregory kicking in Raegan's door to get his dog the night before. Stone said Ledoux continued by saying that if Gregory came at him again, he would "have to drop him[]" because he was "too big of a guy to fight[]" and that Ledoux would "have to put him down." Stone testified that the conversations surrounding Gregory upset him, because some had referred to Gregory as an alcoholic.

Around four or five that afternoon, Stone and his family returned to their home in another part of town. Stone testified that he and Gregory texted that evening about the mowing business, but the texts "turned south" because Gregory learned Amber had taken their bank card away from him and removed Gregory's key to the house from his key ring. According to Stone, Gregory seemed in good spirits until around

7

eight o'clock, when he discovered those items were missing. Stone indicated that the messages raised no real concerns except for maybe a concern about Gregory himself.

Stone said Gregory sent him the last text at 8:11 p.m. that said Gregory was packing his truck and leaving the house. About five minutes later, his sister-in-law, Michelle, called and told him Gregory was dead. When Stone asked what had happened, Michelle said Ledoux shot him.

Stone testified that he had been around Gregory when he was intoxicated and there was not much change in his personality from when he was sober; he was "a very calm person regardless[.]" Stone described Gregory as 6'2" and weighing between 220 and 240 pounds.

## F. Testimony of Michelle Spencer and Jared Spencer

Michelle Spencer and her husband, Jared Spencer, testified for the defense.[3] Michelle is Amber's sister. Michelle testified that she lives on South Main, immediately behind Amber with adjoining yards. Their mother lives next door to Michelle. Around 8 p.m. on the evening of July 4, Michelle was outside cleaning her pool when she heard a gunshot "very close," then heard Amber wailing and say, "Oh, God, no. No, no, no." Michelle said she was not able to see what happened in Amber's yard from where she stood. Michelle testified that she first heard the gunshot, followed by wailing and screaming. Michelle testified she did not hear

---

[3] For purposes of clarity, we refer to the Spencers by their first names.

anything unusual prior to the gunshot. After hearing the gunshot, Michelle ran inside and told her husband they needed to go to Amber's. Michelle testified that Jared immediately ran outside, and she followed.

Michelle described going around the side of her house, where she saw Ledoux in her yard, who had come from Amber's yard. Michelle heard her husband tell Ledoux to "put the gun down." She saw Ledoux in her driveway with the gun in his hand. When she asked what happened, Ledoux repeated, "Why wouldn't he stop?" Michelle testified that Ledoux told her, "I shot Greg." Michelle said her husband and Amber tried to perform CPR on Gregory, but Ledoux walked toward Michelle's mother's house instead of helping Gregory.

Michelle testified that she attended the family gathering earlier in the day and heard Ledoux say that if Gregory came at Raegan again, he would have to stand up to Gregory, which would end badly for him, because Gregory's hands could fit around Ledoux's neck twice. Michelle said that at the time of trial, Ledoux was living in the main residence with Amber and Raegan.

Jared also testified he heard the gunshot and was already on his way out when Michelle told him to come outside. Jared said he immediately headed to the Goldsmiths, and on the way, he saw Ledoux coming over their fence. Jared told him to put the gun down and sit on the concrete. Jared testified that when he arrived at the Goldsmiths, Amber had already started CPR, and he assisted. Jared said they

9

attempted CPR for ten minutes when he pulled Amber away because Gregory had obviously expired.

## G. Testimony of Amber Goldsmith

Amber testified that she and Gregory were married for fifteen years. She testified that before Gregory died, they were having financial difficulties. Gregory did not work, and he would leave the house in the mornings and always return home drunk, which created a tense home environment. Amber testified that Gregory had previously failed to complete outpatient rehabilitation for his alcohol abuse. While she had a facility set up to take him, he refused to go. Amber testified that she wanted Gregory to move out and told him he needed to get out of the house. Amber denied Gregory was docile when he drank and testified toward the end, he had changed.

On July 4, she became concerned about Gregory's mood after she took his debit card from him. Amber explained that she took the card because "he was spending money every day that we didn't have." Amber testified that she asked Ledoux to hide the debit card and keep her wallet out of the house so Gregory could not get it. Ledoux took them to the outbuilding.

Amber testified that in the early afternoon of July 4, she took the debit card. When Gregory realized it was missing later that evening, he approached Amber while she was in the bathtub, and she told him she had taken it. Amber described Gregory as being "very angry" about the debit card. Gregory's behavior concerned

10

her, specifically, kicking the door in, cussing and hollering, "posturing up," and knocking everything off the nightstand. While Amber dressed, Gregory grabbed his spare key and ran outside. This occurred just minutes before the shooting.

Amber testified that after Gregory "walked out" of the house, she went to another part of the house. When she heard Raegan scream "Mom," she looked out the window and saw Gregory going off their steps, heading toward "the kitchen." Amber said Raegan screamed, so she immediately took off toward the door and she heard a gunshot as she went to the front door. Amber characterized Gregory as "moving very fast[]" toward "the kitchen" where Ledoux lived. By the time Amber made it out the front door, the shot had already occurred. She saw Gregory bending over, so she helped him down. Amber testified that Gregory had already cleared the two steps and was on the porch. When she first saw Ledoux, he was standing in the middle of the doorway, holding a long-barreled gun. Amber said she tried CPR.

Amber said she could not hear Gregory or Ledoux say anything while she was inside at the window, only her daughter's very loud scream. Amber testified that Ledoux did not stay and help perform CPR, but she did not know where he went.

## H. Testimony of Raegan Fields

Raegan Fields testified that she is Amber Goldsmith's daughter and Ledoux's girlfriend. At the time of trial, they were all living together on Carla Street. Raegan testified that on July 3, she and Ledoux took the dog with them into her locked room,

11

which made Gregory unhappy. At some point, Gregory kicked in the door. Raegan testified a brief exchange occurred between them and Gregory about the door being locked, but he ultimately left the room.

On July 4, as she left Ledoux's portable building, Raegan saw Gregory outside, and they exchanged angry words. Raegan testified that after the exchange, Gregory ran at her as she stood at the main trailer door. She explained that when Gregory came toward her, she opened the door and yelled for Amber. Gregory had made it to the first step before she heard Ledoux. She testified that she and Gregory heard Ledoux at the same time and looked at him, then Gregory turned toward Ledoux. Raegan noticed Ledoux on the threshold of his door with a gun. Raegan testified that when Ledoux said something to Gregory, Gregory turned from her and charged at Ledoux. Raegan explained that Gregory "got onto [Ledoux's] porch and all the way, almost right up on him before [Ledoux] shot." Raegan said Ledoux was around the door threshold, and when he shot, Gregory stumbled and fell back.

Raegan said of her stepfather that she had hoped Gregory would get help for his drinking but, before he was shot, she had wanted him to move out and get a divorce from her mom.

### I. Testimony of Keenan Dwayne Ledoux

Ledoux testified that his senior year of high school, he was dating Raegan and asked if he could move into their outbuilding due to family problems in his family.

Ledoux testified that he and Gregory "bonded a little more over outdoorsy stuff." They shot guns together often, and he knew Gregory owned guns.

According to Ledoux, on the night of July 3, when Gregory returned from fishing, Raegan and Ledoux went into her room in the main trailer. Ledoux testified he and Reagan had been in bed about fifteen or twenty minutes when they heard the doorknob wiggle. Then, Gregory kicked in the door, charged in, stood over them and yelled that if they wanted to have sex, they needed to do it somewhere else. Gregory and Raegan started arguing, and Ledoux told Raegan to shut up. Ledoux said Gregory had his "[c]hest flared up, fist clinched down by his side, kind of in a leaning forward stance[.]"

Ledoux characterized his relationship with Gregory as "good" until Gregory's alcohol use became "extreme." Ledoux explained that when he told Raegan to shut up, Gregory mistakenly thought Ledoux was talking to him; Gregory said something back, then rushed out of the room. Ledoux had not seen Gregory kick in a door before, and when asked how he felt about it, Ledoux replied, "Stressed. Greg's a lot bigger than me. Just stressed. It wasn't usual of Greg; so, it stuck out. It was just odd of Greg to act aggressive towards me." Ledoux confirmed that Amber gave him the debit card and some other items, which he put in his safe, but testified he did not believe it would cause any problems between he and Gregory.

Ledoux recalled telling people at the family gathering about Gregory kicking in the door and if it happened again, he would have to defend himself and Raegan, but it probably would not go well for him, because Gregory was much bigger. However, Ledoux denied saying he would have to drop Gregory or insinuating he would kill him. He testified that he had no idea there would be a further confrontation between them.

Ledoux said that around 7:30 or 8:00 p.m., Raegan came over to put a necklace he had given her into the safe. He testified that when she left, she did not close the door to the outbuilding all the way, and he heard an argument outside between Raegan and Gregory, and while he could not hear what they were saying, he recognized their voices. Ledoux testified they were not screaming, but it was confrontational, and he was afraid they were fighting. So, Ledoux grabbed his gun and stood by the door to listen. Once he heard Greg say, "I'm going to end you, little girl[,]" he fully opened the door and saw Gregory charging Raegan. At that point, Ledoux pulled the gun and said, "Don't you dare." Gregory responded, "Oh yeah, little boy[,]" and sprinted at Ledoux. Ledoux testified that he had concerns when he heard Gregory and Raegan, because of Gregory's behavior the night before. Ledoux said by the time he opened the door, Gregory was already on the front step of the building's porch. Ledoux explained that when he said, "Don't you dare," Gregory spun and ran towards him, and Ledoux described Gregory as "[a]ggressive." Ledoux

14

confirmed the shotgun was fully loaded with one in the chamber and described it as a "home defense shotgun."

Ledoux testified that he believed Gregory saw the gun pointed at him. Ledoux said Gregory made it to his porch so fast he had no time to react. Ledoux testified that "I believe with my size and Greg's size and a weapon being a part of it, that Greg would have killed me. He would have either hurt me to . . . such a major extent or he would have killed me. . . . that's the only thing I could have concluded from the way he sprinted at me." Ledoux indicated he feared for his life when Gregory rushed him and believed he did not have another choice when he shot Gregory.

Ledoux stated he was in shock after it happened and started walking toward the road, then jumped the fence. Jared told him to put the gun down, so he complied and put the gun down on their driveway. Ledoux testified he talked to Michelle and questioned why Gregory would not stop running. Ledoux said that after he talked to Michelle, he walked to the highway to wait on the police.

Ledoux testified that he provided two statements to the police. Ledoux confirmed that his testimony at trial that Gregory said, "I'm going to end you, little girl[,]" was not mentioned in the typed statements, even though he had the opportunity to add it in. Ledoux also agreed that after Gregory had come into Raegan's room angry the night before, Gregory left the room and went to sleep on the couch. Ledoux confirmed the disagreement the night before the shooting ended

15

without violence, and Ledoux attempted to diffuse the situation at that time by telling Raegan to "shut up."

Despite having his cell phone before the shooting, Ledoux did not call anyone for help, instead he grabbed the loaded shotgun. And, although he did not remember doing it, he assumed he turned the safety on the weapon off. Ledoux admitted he went to the door of the outbuilding with a loaded shotgun before he knew what the issue was between Raegan and Gregory. Ledoux also admitted that he did not see a gun pointed at Raegan, and that Gregory did not have a weapon. Ledoux testified even though Gregory had nothing in his hands, he first chose to point the gun at Gregory, then chose to pull the trigger and kill Gregory. Ledoux also admitted he left, did not try to help Gregory, and did not call 9-1-1. Instead of talking to Gregory to diffuse the situation, he shot and killed him. During Ledoux's testimony, the following exchange occurred:

> Q: Mr. Ledoux, on July 4th of 2017[,] in Orange County, Texas, you did in fact, intentionally and knowingly cause the death of Gregory Goldsmith, correct?
> A: Yes, ma'am.
> Q: And you did that by shooting him with a firearm.
> A: Yes, ma'am.

## J. Forensic Evidence (Pathologist/Crime Lab Experts/Officer Jeff Courts)

Detective Jeff Courts of the Vidor Police Department testified regarding his collection of evidence at the scene. He described the steps he took to secure the evidence and calling the Jefferson County Crime Lab to assist with processing the

16

scene. Courts testified that on July 4, 2017, they retrieved a gun from the backyard of 1125 South Main Street. In the weapon "were three rounds of Federal 3-inch Magnum double [a]ught buckshot."

Ryan Mudd testified that he works in the firearm section of the DPS crime lab in Austin. In this case, they received items for testing, including one shotgun, four unfired shotgun shells, a green shirt, a fired shotgun shell case, a fired wad, and 13 lead pellets. Investigators requested a distance determination and toolmark analysis. Mudd opined the shot was fired "at a distance greater than contact and less than 8 feet from the muzzle[.]"

Dr. John Wayne, a forensic pathologist employed with Forensic Medical Management Services of Texas, testified that he performed the autopsy on Gregory Goldsmith. Dr. Wayne explained that the injury was consistent with a shotgun wound. He estimated the shotgun was fired from between four and eight feet away. Based on the x-rays, it was buckshot, and Dr. Wayne retrieved fifteen pellets from the body. The toxicology results revealed that Gregory's blood alcohol content was .341, which was four times the legal limit for driving. Dr. Wayne opined that a penetrating gunshot wound to the torso caused Gregory's death.

Mark Steele, formerly a detective with the Vidor Police Department, testified that he handled cellular forensics.[4] He was asked to make a digital copy of the cell phones in the case. Steele testified that Ledoux, Raegan, and Amber signed consents to search their phones. He explained text messages were missing from Amber's phone for the month of July, but there were messages before and after. Steele characterized the lack of messages on Amber's phone for July as unusual and found it suspicious. He believed due to the lack of texts messages for just that month, "it was a massive dump. . . . [o]r a deletion on just the information in the text messaging." There were not many deleted messages from Raegan's or Ledoux's phones.

**K. Other Evidence: Photographs, Text Messages, 9-1-1 Recording**

A recording of Howell's 9-1-1 call was admitted as evidence and played for the jury. In the recording, Howell sounds very upset and describes witnessing the shooting across the street from her house. Howell named Ledoux as the shooter and told the operator that Ledoux left the scene after the shooting. Photographs of the crime scene, weapon, and victim were also admitted at trial. Several photographs showed the proximity of the outbuilding where Ledoux resided to the main trailer.

---

[4] Steele testified that he resigned from Vidor Police Department to start his own business.

The State introduced text messages between Raegan and Ledoux several months before this happened regarding Gregory, including the following:[5]

> Ledoux: Well there is nothing you can do.
> Raegan: I asked her what she would be okay with happening to him[.] Said she didn't want him dead, but maybe he needs to go to prison to sober up[.] I told her that could happen, he could be set up[.]

### III. Standard of Review

In evaluating legal sufficiency of the evidence to prove the charged offense, we must review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, the reviewing court gives full deference to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume the jury resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010). Despite being permitted to draw reasonable inferences from the evidence, a jury is not permitted to draw conclusions based on speculation or

---

[5] Raegan testified that Ledoux listed her in his phone as "Homegirl," which is what the text messages displayed.

factually unsupported inferences or presumptions. *Hooper*, 214 S.W.3d at 15. The jury is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by each witness. *Metcalf*, 597 S.W.3d at 855 (citations omitted).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (quoting *Hooper*, 214 S.W.3d at 13). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

## IV. Analysis

### A. Issues One and Two: Intentionally or Knowingly

In his first two issues, Ledoux challenges the sufficiency of the evidence to support the jury's verdict, specifically the intentional or knowing element. A person commits murder "if he [] intentionally or knowingly causes the death of an individual[.]" Tex. Penal Code Ann. § 19.02(b)(1). "Murder is a 'result of conduct' offense, which means that the culpable mental state relates to the result of the

20

conduct, i.e., the causing of the death." *Schroeder v. State*, 123 S.W.3d 398, 400

(Tex. Crim. App. 2003). The Texas Penal Code provides that

> (a) A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.
> (b) A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Tex. Penal Code Ann. § 6.03(a), (b).

It is undisputed that Ledoux caused Gregory's death. At issue is whether he did so intentionally or knowingly. Every witness who testified identified Ledoux as the shooter. The evidence further established that Ledoux grabbed a loaded shotgun, released the safety, and shot the victim at close range.

> [I]t has been long held that the intent of a defendant may be ascertained or inferred from the means used and the wounds inflicted. Intent to commit murder may be shown by the use of a deadly weapon per se. In fact, where a deadly weapon is fired at close range and death results[,] the law presumes an intent to kill.

*Womble v. State*, 618 S.W.2d 59, 64 (Tex. Crim. App. 1981) (citations omitted); *see also Draper v. State*, 335 S.W.3d 412, 415 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) (intent to kill could be inferred where defendant used a deadly weapon, a firearm, at close range killing the victim). Ledoux told people he "was going to have to drop [Greg]" and "have to put [Greg] down[]" because he was too big to fight.

21

Importantly, when questioned at trial, Ledoux admitted that he intentionally and knowingly killed Greg Goldsmith with a firearm.

We conclude that the evidence was sufficient to support the jury's determination that Ledoux acted intentionally or knowingly when he fired a shotgun at close range, killing the victim. We overrule issues one and two.

## B. Self-Defense

In his third issue, Ledoux further challenges the sufficiency of the evidence, "because the State failed to prove beyond a reasonable doubt that Appellant did not act in self-defense." Texas recognizes the defense of justification, which excludes criminal responsibility for otherwise criminal behavior. *See* Tex. Penal Code Ann. § 9.02. Self-defense is one type of justification. *See id.* § 9.31. "[A] person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a).

> [A] defendant bears the burden of production, which requires the production of some evidence that supports the particular defense. Once the defendant produces such evidence, the State then bears the burden of persuasion to disprove the raised defense. The burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory.

22

*Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (citing *Saxton v. State*, 804 S.W.2d 910, 913–14 (Tex. Crim. App. 1991)). In reviewing a challenge to the sufficiency of the evidence to support the jury's implicit rejection of self-defense,

> we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.

*Saxton*, 804 S.W.2d at 914. Self-defense is a fact issue the jury determines, and it is free to accept or reject any defensive evidence on the issue. *See id.* at 913–14.

Despite Ledoux's testimony that Gregory ran at him, other evidence contradicted this. Specifically, an eyewitness and neighbor testified that she saw Gregory walking toward Ledoux at a normal pace. She also testified that she did not see or hear any argument before the gunshot. Other neighbors and family members in the vicinity likewise testified they did not hear shouting prior to the gunshot. Additionally, Ledoux told the jury that he grabbed the loaded gun when he heard "aggressive and confrontational" voices but before he knew what Raegan and Gregory were discussing. The evidence established that Ledoux left the scene with the firearm, did not call 9-1-1, and did not attempt to assist with CPR.

Viewing the evidence in the light most favorable to the verdict and deferring to the jury's role to weigh the evidence and witnesses' credibility, we conclude the

23

evidence is sufficient to support the jury's implicit rejection of Ledoux's self-defense claim. *See Saxton*, 804 S.W.2d at 914. Specifically, a rational trier of fact could have found the essential elements of murder beyond a reasonable doubt and rejected Ledoux's self-defense claim. *See id.* We overrule issue three.

## V. Conclusion

We hold the evidence was sufficient to support the jury's verdict that Ledoux intentionally or knowingly killed Gregory Goldsmith with a firearm and to support the jury's rejection of Ledoux's claim of self-defense. We affirm the trial court's judgment.

AFFIRMED.

_____
CHARLES KREGER
Justice

Submitted on April 26, 2021
Opinion Delivered August 11, 2021
Do Not Publish

Before Golemon, C.J., Kreger and Horton, JJ.

24